## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| OSCAR TAYLOR, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:10-cv-01611-TWP-DML |
| | ) | |
| ELI LILLY & COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

### ENTRY ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This matter is before the Court on Defendant Eli Lilly & Company's ("Lilly"), Motion for Summary Judgment. The Plaintiff in this case, Oscar Taylor ("Mr. Taylor"), has filed a claim for discrimination in promotion and pay against his employer on the basis of his race pursuant to 42 U.S.C. § 1981. Specifically, Mr. Taylor claims Lilly intentionally denied him a merit pay increase as an account executive in 2006 and 2007 because he is African-American, while similarly situated Caucasian account executives were awarded merit pay increases. Additionally, he alleges that he was demoted from his account executive position to a sales representative position based on his race. Lilly contends that each of Mr. Taylor's disparate claims fail because he cannot show a *prima facie* case of discrimination. Alternatively, Lilly asserts that even if Mr. Taylor could establish a *prima facie* case, his claims still fail because he cannot demonstrate that Lilly's actions were pretextual. For the following reasons, Lilly's Motion for Summary Judgment (Dkt. 48) is **GRANTED**.

## I.  BACKGROUND

### A.    Mr. Taylor Joins Eli Lilly & Company

Because this Entry addresses a motion for summary judgment, the following facts are undisputed and reflect evidence in the light most reasonably favorable to Mr. Taylor, the non-

moving party.  *See Luster v. Ill. Dep't of Corrs.*, 652 F.3d 726, 728 (7th Cir. 2011).  Mr. Taylor joined Lilly, a global drug pharmaceutical manufacturing company, in 2001 as a sales representative in its Neuroscience division.   As a sales representative in the neuroscience division, his role involved calling psychiatrists in prisons and correctional facilities in different states to develop a market for Lilly's products.  Some of the Lilly products Mr. Taylor promoted included the drugs, Prozac, Cymbalta, and Zyprexa.  During this initial period, Mr. Taylor was one of only three Lilly sales representatives to be tasked with the responsibility of calling prisons and correctional facilities.  Mr. Taylor reported to Steven Upshaw, the district sales manager.

With respect to salary, Lilly grouped its sales representatives into three pay scale groups (1 through 3) with each respective group representing a higher level of expertise and compensation range.  Beyond the three pay scale groups, Lilly maintained a fourth pay scale group for account managers or account executives which consist of an "elite group of Lilly's most skilled sales persons." When Mr. Taylor was first hired by Lilly he was classified as a pay level 52 employee, a higher salary level than the typical entry-level sales representative. After joining the Neuroscience division, Mr. Taylor continued to work as a sales representative for the next three years and continued to receive merit pay increases throughout that period.

Sometime in 2004, Lilly reorganized the Neuroscience division and rolled its employees, including Mr. Taylor, into a new group called the Neuroscience Corrections division. Neuroscience Corrections consisted of 10 to11 representatives, who reported to the district sales manager Donald Olney, and later Carlos Banks.  Through the formation of this new division, Lilly intended to firmly expand marketing of its products to correctional facilities.  As a member of this new group, Mr. Taylor's title changed to Neuroscience Correction Specialist, and he

worked in this newly formed division for one year promoting Lilly's products in various states including Texas, Arkansas, Oklahoma, and Mississippi.

**B.      Formation of the B2B Corrections Group**

In late 2004 or early 2005, Lilly decided to replace the Neuroscience Corrections division with a division titled the Business to Business ("B2B") group.  Lilly created several new account executive positions within the new group including the B2B Corrections group.  This group replaced the Neuroscience Corrections division.   An account executive within the B2B Corrections group would have two primary job responsibilities: (1) promote "access" by persuading formulary decision makers at a given correctional facility to add Lilly's medications to their inventory and (2) maximize Lilly's product sales within these accounts.  Importantly, the ability to gain or promote access was one of the most important factors evaluated by an account executive's manager(s) during his or her Performance Management assessment.  In addition to evaluating access, the manager would also review an account executive's sales numbers in relation to quotas as well as their behavior in achieving both results.  These duties would subsequently be evaluated and documented in the employee's personnel file.  Based on an employee's Performance Management assessment, he could be classified as eligible for a merit pay increase.  However, pursuant to Lilly's guidelines, merit pay eligibility did not automatically ensure that an employee would receive a merit pay increase.  A merit pay increase would be awarded to a B2B account executive after their performance evaluations were ranked and compared to Lilly's competency model, the Achieving Account Management Excellence or AAME.

**C.      Mr. Taylor Accepts Account Executive Position within the B2B Group**

After the formation of the B2B Corrections group, many of the former Neuroscience

Correction employees, including Mr. Taylor, applied for one of the highly coveted B2B positions.  According to Mr. Taylor, at the time the B2B Corrections group was formed he estimated that there were likely only thirty-five B2B account executives companywide.  As such, Mr. Taylor applied for a B2B position with Chris Fletchall ("Mr. Fetchall"), the regional manager for the B2B Corrections group around late 2004 and early 2005, and was accepted. With the higher level position, Mr. Taylor moved from pay level 52 to pay level 54 because account executives are in pay scale group 4.  After taking over this new role, Mr. Taylor's base salary of approximately $62,760.00 in 2004 increased to $96,820.00 in 2005.  *See* Def. Brief, Dkt. 50 at 3.  Along with Mr. Taylor, Vince Visingardi ("Mr. Visingardi"), Dana (Dane) Roberts ("Mr. Roberts") and Brenda Vickery ("Ms. Vickery") were also selected from the former Neuroscience Corrections division to be account executives within the B2B Corrections group.

From approximately January 2005 to the middle of that year, Mr. Taylor worked under Mr. Fletchall, and testified that Mr. Fletchall was a good manager, and he had no issues with his supervision.  In late 2005, Mr. Fletchall moved to another division within Lilly and was replaced by Mark Russom ("Mr. Russom"), who became the regional manager for the B2B Corrections group and the B2B Long Term Care group.  Mr. Taylor, Mr. Visingardi, Mr. Roberts, and Ms. Vickery all reported to Mr. Russom.  With respect to Mr. Taylor's account, fifty to sixty percent of it involved promoting access and sales of Zyprexa and Cymbalta to prisons and jails located in Texas.  *See* Dkt. 48-1 at 95:6-13.  According to Mr. Taylor, Mr. Russom presented him with the task of persuading the formulary decision makers within the Texas prisons and jails to use Lilly's psychiatric medications, such as Zyprexa, by placing it in their inventories.  As an account executive, Mr. Russom expected Mr. Taylor to draw from his account management skills with the help of Lilly's competency model, Achieving Account Management Excellence ("AAME"),

4

to achieve the above mentioned goal.[1]  In addition to using their account management skills, Mr. Russom expected the account executives working under him to utilize strategic planning to break up the process of selling products to a given customer into what is known as "advances."

**D.     Mr. Taylor's Experience as a B2B Account Executive in 2005**

In 2005, Mr. Taylor began to manage his correctional accounts by using his account management skills to improve access and sales of Lilly's products such as Zyprexa and Cymbalta in correctional facilities.  Mr. Taylor was in charge of an eight state region.  In 2005, his biggest account involved Texas's correctional facilities.  Texas corrections had removed Lilly products including Zyprexa, from its formulary before Mr. Taylor joined the B2B Corrections group.  According to Mr. Taylor, Lilly's products could costs at least twice as much as its competitors.  And, as an account executive, Mr. Taylor did not have the authority to adjust contracts and prices, offer rebates, or authorize collaborations on research grants.  However, despite his higher sales numbers relating to Zyprexa and Cymbalta, Mr. Russom noted in Mr. Taylor's Performance Management assessment for 2005 that he was not achieving great access regarding Zyprexa in the formularies in Texas.  Specifically, Mr. Russom noted in Mr. Taylor's assessment "overall sales and access performance was significantly below expectations and below peer group at 89 percent to quota" and "[c]lear improvement in overall AAME behaviors is needed in 2006 with specific focus needed on gaining advances that will help improved product access."  Dkt. 48-1 at 86.  Notably, Mr. Russom also listed Mr. Taylor as "needing improvement" in three of seven Leadership Behavior categories.  Despite this assessment, Mr. Russom did indicate that Mr. Taylor was eligible for a merit pay increase.[2]

---

[1] According to Mr. Taylor, he testified that the AAME consisted of a six to seven page form document that collected highly detailed information about an account and action plans relating to such an account.  Dkt. 48-1 at 92:12.

[2] As discussed previously, even though an employee is eligible for a merit pay increase, such eligibility does not ensure the employee will automatically receive a merit pay increase.  Dkt. 48-2 at 138:9-13.

Based on Mr. Russom's assessment of Mr. Taylor's performance regarding his AAME-related skills, Lilly did not award Mr. Taylor a merit pay increase in 2006, for his performance in 2005.  Three of the other account executives in the B2B Corrections group, all of whom were Caucasian, did receive merit pay increases in 2006 for their performances in 2005.  However, in each of their respective evaluations Mr. Russom indicated that they achieved at least 100% or better in improving access and sales of Zyprexa or Cymbalta in their respective accounts.  In addition to achieving higher results, both Ms. Vickery and Mr. Visingardi achieved higher ratings than Mr. Taylor in the Leadership Behavior category.[3]

### E.    Mr. Taylor's Experience as a B2B Account Executive in 2006

In the first part of 2006, Mr. Taylor continued to manage his accounts by attempting to improve overall access and sales of Zyprexa within correctional facilities and jails.  Mr. Russom continued to monitor Mr. Taylor's ability to improve access of Zyprexa to the formulary of his largest account, the state of Texas.  At some point in 2006, in an attempt to improve access, Mr. Taylor arranged a meeting between Mr. Russom and Dr. Owen Murray, Chief Medical Director for the University of Texas Medical Branch.  Because he could not unilaterally address Dr. Murray's concerns as an account executive, Mr. Taylor arranged for Mr. Russom to attend the meeting.  Both Mr. Taylor and Mr. Russom testified that the meeting did not result in any meaningful improvement of access relating to Zyprexa becoming a part of any formularies in Texas.  In a later assessment of Mr. Taylor's performance for 2006, Mr. Russom indicated that Mr. Taylor's inability to create a strategic plan to influence Dr. Murray into realizing the benefit

---

[3] In Lilly's reply brief, it objected to the admissibility of its employees' Performance Management evaluations based on the grounds of Mr. Taylor's failure to authenticate such documents and in the alternative arguing that they are inadmissible hearsay.  The Court overrules Lilly's objection to the authentication of these documents because Lilly produced these files during the course of pretrial discovery.  *See U.S. v. Brown*, 688 F.2d 1112, 1116 (7th Cir. 1982) (determining that a party's "very act of production was implicit authentication").  Furthermore, these evaluations are non-hearsay admissions of a party-opponent under Fed. R. Evid. 801(d)(2)(A).

of placing Zyprexa into correctional or jail formularies demonstrated his deficient skill as an account manager.[4]  *See* Dkt. 48-2 at 107:6-22.

Following this meeting, on or around June 20, 2006, Mr. Russom issued Mr. Taylor a performance-based verbal warning, which emphasized his slow progress in developing his strategic account planning as well as the need to improve his access and sales results through the use of AAME-related skills.  The verbal warning also set forth a development plan.  Dkt. 48-2 at 115:22-117:10.  Subsequently, the verbal warning was memorialized into a written warning and given to Mr. Taylor.

## F.    Mr. Taylor Transfers to a New Position Within Lilly

Between March and April 2006, Lilly's management began to consider disbandment of the B2B Corrections group.  Before the B2B Corrections group was disbanded, Mr. Russom suggested that based on Mr. Taylor's skills associated with building and leveraging customer relationships he should apply for various sales representative positions.  While Mr. Taylor indicated that he preferred to stay in his B2B account executive role, he began to apply for sales positions in June 2006 because Mr. Russom told him he would not recommend him for a district management position or a specialized position with the oncology group.  Ultimately, Mr. Taylor applied for and obtained a senior sales representative position in the diabetes health group.[5]  Mr. Taylor transferred to this group in July 2006 without any reduction in salary or pay level.  Both Ms. Vickery and Mr. Visingardi also returned to sales representative positions around the same

---

[4] However, in February 2006, Lilly's U.S. Sales and Training and Development Department conducted an AAME-related skills assessment with respect to the B2B Corrections group.  According to the assessment report, Mr. Taylor scored higher than his other B2B account executives in terms of understanding AAME-related skills.  There is no indication that Mr. Russom used this assessment in any of his evaluations.  With respect to this separate AAME assessment, Lilly objects to it on the basis that it is inadmissible hearsay.  Dkt. 57 at 4.  The Court finds that this assessment is admissible as non-hearsay admissions of a party-opponent under Fed. R. Evid. 801(d)(2)(A).

[5] The diabetes health group has a pay scale group 1 classification, while the oncology group has a pay scale group 2 classification.

time.  Mr. Roberts, on the other hand, remained with the B2B Corrections group longer and ultimately moved into the public health group, which received the larger accounts from the former corrections group.

With input from Mr. Russom, Mr. Taylor's new manager, Baryona Billington, conducted his Performance Management assessment based on his performance in 2006.  The assessment stated in relevant part that "[his] overall performance to quota was below expectations driven by our key function—the access metric.  He required significant coaching on MME and made little progress on the strategic application needed to make change regarding access to our products in several key accounts."  Dkt. 48-1 at 96.  However, Mr. Taylor received positive feedback with respect to his strengths associated with the selling aspect of Lilly's products as an account executive.[6]  *Id.*   Additionally, Mr. Taylor received positive feedback from his new manager regarding his strength in sales and work ethic as they applied in his new role as a senior sales representative.  *Id.*   Thereafter, Mr. Taylor was granted merit pay eligibility, but due to his transfer to a lower pay scale group and his already high salary pay grade, his performance assessment did not support a pay raise increase under Lilly's guidelines.

## G.    Mr. Russom's Inappropriate Comments

In December 2009, Mr. Russom was reported to Lilly's human resources department for making inappropriate comments to his direct reports in the context of a hiring decision.  An internal investigation determined that after filling an open position, Mr. Russom commented to several of his direct reports, "I was able to fill it with a white man.  This is the last white man that will be promoted here at Lilly," and "It is a difficult time for a white man due to the hurdles

---

[6] In his performance summary regarding his new position, it stated that "Oscar had a good first half of 2006 with regards to his significant sales activity and focused effort to drive Zyprexa and Cymbalta sales quota...Oscar demonstrated a strong work ethic and the ability to create tremendous relationships.  His sales ability is the strength area that I believe he should leverage to further his career."  Dkt. 48-1 at 96.

the company gives."  After an internal investigation concerning the comments was completed, Lilly determined that the allegations of discrimination based on gender and race were not substantiated.[7]  Additional facts are added below as needed.

## II.  <u>LEGAL STANDARD</u>

Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  *Hemsworth v. Quotesmith.Com, Inc.*, 476 F.3d 487, 489-90 (7th Cir. 2007).  In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the nonmoving party and draw[s] all reasonable inferences in that party's favor." *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) (citation omitted).  However, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted).  "In much the same way that a court is not required to scour the record in search of evidence to defeat a motion for summary judgment, nor is it permitted to conduct a paper trial on the merits of a claim."  *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) (citation and internal quotations omitted).  "[N]either the mere existence of some alleged factual dispute between the parties nor the existence of some metaphysical doubt as to the material facts is sufficient to defeat a motion for summary judgment." *Chiaramonte v. Fashion Bed Group, Inc.*, 129 F.3d 391, 395 (7th Cir. 1997) (citations and internal quotations omitted).

---

[7] Lilly argues that the investigation summary report documenting Lilly's investigation of Mr. Russom's comments is inadmissible hearsay.  The Court finds that this report is a non-hearsay admission by a party opponent under Fed. R. Evid. 801(d)(2)(A).

# III.  DISCUSSION

Mr. Taylor argues that Lilly intentionally discriminated against him on the basis of race by denying him merit pay increases in 2006 and 2007 as well as demoting him from his account executive position with B2B to a sales representative position in the diabetes health group.  Lilly counters by asserting that there is no direct evidence of discrimination.  In addition, Lilly argues that Mr. Taylor's disparate pay claim fails as a matter of law because he cannot identify a similarly situated individual who was awarded a higher merit pay increase during the period at issue.  Finally, Lilly asserts that Mr. Taylor's disparate demotion claim must also fail because Mr. Taylor cannot identify any similarly situated employees or demonstrate that his demotion was an adverse employment action.  The Court will address each of Mr. Taylor's claims in turn.

## A.      2006 and 2007 Disparate Pay Claims

Mr. Taylor brings two disparate pay claims under Section 1981, alleging that he was denied a merit pay increase in 2006 and 2007 based on his race.  Section 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts…as is enjoyed by white citizens."  42 U.S.C. § 1981.  Additionally, a plaintiff alleging discrimination under Section 1981 may prove such discrimination using the direct or indirect method of proof.  *Andonissamy v. Hewlett-Packard Co.*, 547 F.3d 841, 849-50 (7th Cir. 2008); *see also Runyon v. McCrary*, 427 U.S. 160, 174 n.11, 96 S.Ct. 2586, 49 L.Ed. 415 (1976) (noting that the legislative history of the Civil Rights Act reveals that section 1981 and Title VII provide alternative remedies to civil-rights violations).  In order to establish a *prima facie* case of race discrimination under the direct method, the plaintiff must prove that the defendant was motivated by animus based upon his race when he was denied a merit pay increase.  *Sun v. Bd. of Trustees of the Univ. of Ill.*, 473 F.3d 799, 812 (7th Cir.

2007).  Absent direct or circumstantial evidence to prove race discrimination under the direct method, the plaintiff must utilize the indirect method.  *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed. 2d (1973) (setting forth the elements of the indirect method).

Under this method, a plaintiff can establish a *prima facie* case for race discrimination resulting in disparate pay by showing that: (1) he is a member of a protected group; (2) he was fulfilling his employer's legitimate performance expectations; (3) he suffered an adverse employment action; and (4) he was treated less favorably than similarly situated employees outside of the protected class.  *Dandy v. United Parcel Service, Inc.*, 388 F.3d 263, 274 (7th Cir. 2004).  If the plaintiff establishes a *prima facie* case of discrimination, the burden of production shifts to the defendant to articulate a non-discriminatory reason for the adverse employment action.  *Sun*, 473 F.3d at 814.   If the defendant does so, the burden shifts back to the plaintiff to submit evidence demonstrating that its explanation is pretextual.  *See Keeton v. Morningstar, Inc.*, 667 F.3d 877, 884 (7th Cir. 2012).   To establish pretext, a plaintiff must "identify such weaknesses, implausibilities, inconsistencies, or contradictions in [defendant's] proffered reasons that a reasonable person could find them unworthy of credence and hence infer that [defendant] did not act for the asserted non-discriminatory reasons."  *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 792 (7th Cir. 2007).  Because Mr. Taylor has offered no direct or circumstantial evidence in accord with the direct method to establish his disparate pay discrimination claim, he must rely upon the indirect method.

### 1.    2006 Disparate Pay Claim

With respect to establishing a *prima facie* case for Mr. Taylor's 2006 disparate pay claim, neither party disputes the establishment of the first three elements.  As such, this claim turns on

the fourth element regarding "similarly-situated" employees.  On this issue, Mr. Taylor argues that two Caucasian account executives in the B2B group, supervised by Mr. Russom—Brenda Vickery and Vince Visingardi—were similarly situated to him based on their Performance Management evaluations.  *See* Pl. Resp. Br., Dkt. 52 at 17-18.  Lilly counters by arguing that Mr. Taylor cannot show that Ms. Vickery or Mr. Visingardi are similarly situated to him.  The Court agrees.

In evaluating whether two employees are directly comparable, "a plaintiff must at least show that the comparators (1) dealt with the same supervisor, (2) were subject to the same standards, and (3) engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them."  *Id.* at 848 (citations omitted).  *See generally Warren v. Solo Cup Co.*, 516 F.3d 627, 630-31 (7th Cir. 2008) ("An employee is similarly situated if the employee is comparable to the plaintiff in all *material* respects.") (emphasis in original and citation and internal quotations omitted).

In this case, Mr. Taylor cannot establish a *prima facie* case because Ms.Vickery and Mr. Visingardi are not comparable to him in all material aspects.  Simply stated, their access and sales performances relating to Zyprexa in 2005 were significantly better than Mr. Taylor's.  For instance, during 2005, both Ms. Vickery and Mr. Visingardi were evaluated by Mr. Russom and were found to have achieved 100% access of Zyprexa for their own respective territories, while introducing multiple drugs into prison formularies.  *See*  Dkt. 52-9 at 1; Dkt. 52-10 at 1.  In addition, Mr. Visingardi received a "successful" rating in five categories and Ms. Vickery received the same rating in all seven categories regarding "Leadership Behavior."  Dkt. 52-9 at 1; Dkt. 52-10 at 1.  On the other hand, in  Mr. Taylor's performance review for 2005, Mr. Russom determined that his "overall sales and access performance was significantly below

expectations and below [his] peer group at 89 percent to quota." *See* Dkt. 48-1 at 247:11-13. Mr. Russom also stated that Mr. Taylor needed to improve his overall AAME behaviors in order to structural plan a way to drive improved product access with his accounts. *Id.* at Ex. 5. Furthermore, Mr. Taylor only received a "successful" rating in four out of the seven "Leadership Behavior" categories based on his 2005 performance. *Id.* Accordingly, Ms. Vickery and Mr. Visingardi are not materially comparable to Mr. Taylor based on the differences in performance regarding access and sales, and Mr. Russom considered these difference when he awarded merit pay to Ms. Vickery and Mr. Visingardi. *See* Dkt. 48-3 at 139:25-140:19 (describing how Lilly allocated Mr. Russom a fixed budget for merit pay according to performance rankings among account executives); *see also Robinson v. Honeywell, Micro Switch Div.*, 2002 WL 31828433, *at 2 (Dec. 12, 2002 7th Cir. 2002) (rejecting the claim that employees who received an overall rating of "Consistently Meets Expectations" were similarly situated for purposes of a race-based disparate pay claim where the plaintiff received the lowest possible rating in three subcategories and comparator received it in only one subcategory).

Mr. Taylor counters by relying on *Barricks v. Eli Lilly & Co.*, 481 F.3d 556 (7th Cir. 2007), for the proposition that low-performing employees may be similarly situated even though they lack identical ratings. *See* Pl. Resp. Br., Dkt. 52 at 18.; *see also Coleman v. Donahoe*, 667 F.3d 835, 846 (7th Cir. 2012) (noting that the similarly situated analysis is a "flexible, common-sense examination" and while the employee "must be directly comparable to the plaintiff in all material respects,…[he] need not be identical in every conceivable way.") (internal quotations and citation omitted). However, Mr. Taylor's argument is not bolstered by the Seventh Circuit's "similarly situated" analysis in *Barricks*. In *Barricks*, the Seventh Circuit articulated that "given the important role of the evaluation in Lilly's calculation of raises, [plaintiff] should have

13

<u>included in the record [comparator's] evaluation</u> so that we could rule out performance as the basis for [comparator's] receiving a raise and [plaintiff's] disappointment." *Barricks*, 481 F.3d at 560 (emphasis added).  The court subsequently found that even if the employees were similarly situated, the plaintiff failed to show that Lilly's stated reason for denying her a raise was pretextual. *Id.* at 560-61.

Here, unlike in *Barricks*, evidence *was submitted* as to each employee's performance evaluation.  The differences in their performance evaluations – 89% access achieved by Mr. Taylor as compared to 100% access achieved by both Ms. Vickery and Mr. Visingardi for 2005 – confirm that Mr. Taylor was not comparable in all material respects to his proposed comparators. *See Senske v. Sybase, Inc.*, 588 F.3d 501, 510 (7th Cir. 2009) ("Although the 'similarly situated' concept is a flexible one, the comparators must be similar enough that differences in their treatment cannot be explained by other variables, such as distinctions in their roles or performance histories.") (internal citation omitted).  Simply stated, despite Mr. Taylor's assertion that the Texas assignment presented unique challenges, his performance with respect to improving access was lackluster compared to his proposed comparators.  Accordingly, although the "similarly situated" inquiry is a flexible one, the differences in performance evaluation undermine the comparison between Mr. Taylor and his proposed comparators for purpose of assessing the "similarly situated" element. *See Silverman v. Bd. of Educ. of the City of Chicago*, 637 F.3d 729, 742-43 (7th Cir. 2011) (finding plaintiff was not similarly situated to another teacher in the context of a retaliation claim when there was a difference in their performance evaluations).  As such, Mr. Taylor has failed to establish his *prima facie* case with respect to his 2006 disparate pay claim.

### 2.      2007 Disparate Pay Claim

Mr. Taylor also contends that Lilly's decision to deny him a merit pay increase in 2007 as a B2B account executive was a result of race-based discrimination.  However, Mr. Taylor's 2007 disparate pay claim also fails because he cannot establish that he is similarly situated with another Lilly employee.   Specifically, Mr. Taylor bases his *prima facie* case on comparing himself to one potential comparator, Brenda Vickery.  However, in 2006, Ms. Vickery, Mr. Visingardi, and Mr. Roberts ended the year with different job positions while reporting to different supervisors than Mr. Taylor.   Additionally, Ms. Vickery, Mr. Taylor's purported comparator, was not in the same pay scale group as Mr. Taylor.  After leaving the B2B group, Mr. Taylor moved to a sales position classified under pay scale group 1, while Ms. Vickery moved to a sale position classified under pay scale group 2.  The Seventh Circuit has articulated that "[i]t is clear that [co-workers] were not similarly situated to [plaintiff] because they reported to different supervisors and had different levels of experience and job responsibility." *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 681 (7th Cir. 2002).   Because Ms. Vickery's Performance Management review, which was the basis for obtaining merit pay, was completed by a different supervisor than the one who completed Mr. Taylor's review, Mr. Taylor cannot show meaningful similarity to Ms. Vickery.  *See Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 618 (7th Cir. 2000) (stating that when "different decision makers are involved, two decisions are rarely similarly situated in all relevant respects.") (citations and internal quotations omitted). Accordingly, Mr. Taylor has not established a sufficient *prima facie* case of race discrimination based on his 2007 disparate pay claim.

### 3.      Pretext

Even if Mr. Taylor was able to demonstrate a *prima facie* case of race discrimination, he

would not be able to show that Lilly's legitimate, non-discriminatory reason for not granting him a merit pay increase during that time period was pretextual.  To establish pretext, Mr. Taylor must show that his employer did not honestly believe in the reasons it gave for not awarding him the merit pay increase.  *Keeton*, 667 F.3d at 885.  Here, Lilly has articulated a legitimate, non-discriminatory reason for not granting Mr. Taylor a merit pay increase in 2006 and 2007.  Specifically, Lilly contends that Mr. Taylor failed to accomplish and meet one of his primary duties as an account executive: to gain and improve access of Lilly's products into various correctional formularies by using his AAME-related skills.  In considering whether to award an employee a merit pay raise, Mr. Russom testified as follows:

> I would rate and rank people and look at their performance versus our standard, which is our competency model.  I would look at leadership behaviors…I would evaluate them on leadership behaviors.  And I, obviously, would look at their results as well, which is, you know, how did they do from an access perspective, number one, that's what we do in B2B, right, is access, and then also from sales. And then the behavior piece is kind of a culmination of everything, the leadership behaviors, their approach in how they approach the accounts, the behaviors around their account management.

Dkt. 48-2 at 140:6-19.  Additionally, Mr. Russom testified that due to Lilly's guidelines, it allocates a fixed budget for awarding merit pay to its account executives based on performance rankings.  *See* Mr. Russom Dep., 48-2 at 138:9-13.  As such, Lilly's proffered reason is consistent with Mr. Russom's testimony and Ms. Vickery's and Mr. Visingardi's Performance Management reviews from 2005, which demonstrate that they, unlike Mr. Taylor, exceeded their performance goals regarding access for Lilly's medicines.  Accordingly, Mr. Russom's testimony and the evidence associated with the employee reviews is also consistent with Lilly's proffered reason that the difference in performance rankings between Mr. Taylor and the other B2B account executives concerning "access" accounted for the difference in merit pay between the employees in 2006 and 2007.

16

Because Lilly has satisfied its burden of articulating a legitimate, non-discriminatory reason relating to its alleged adverse employment action against Mr. Taylor, Mr. Taylor must offer evidence that Lilly's facially neutral explanation for its pay disparity is pretextual.  First, Mr. Taylor argues that Mr. Russom's assessment of his AAME-related account management skills was not sincere because it contradicted a previously administered AAME assessment report given to B2B account executives testing their understanding of the AAME process. Second, Mr. Taylor challenges the credibility of Lilly's non-discriminatory reason by attacking the accuracy of Mr. Russom's evaluation of his performance.  Pl. Resp. Br., Dkt. 52 at 22. Lastly, Mr. Taylor argues that Mr. Russom's negative assessment during his Performance Management review was pretextual based on an inappropriate comment uttered by Mr. Russom over two years after Mr. Taylor had resigned from Lilly.  The Court is not persuaded by these arguments.

Mr. Taylor has not presented sufficient evidence to suggest that the AAME report played any role in Mr. Russom's evaluation of his performance using AAME-related skills to obtain access results.  Furthermore, even if Mr. Russom had an opportunity to review the AAME report, the report only tested Mr. Taylor's "understanding" of AAME management skills, but not his actual performance utilizing those skills.   Thus, the report does not cast any doubt on Mr. Russom's honest belief that Mr. Taylor's performance in obtaining access was below Lilly's quota due to his inability to develop a strategic accounting plan.  *See Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1460 (7th Cir. 1994) (noting that such evidence "does not shed any light on whether the employer honestly based its employment decision on performance-related considerations, which is the focus of our inquiry in these cases").  Additionally, Mr. Taylor's argument that the tough Texas market associated with psychiatric drugs was the cause for his

17

low performance is unpersuasive.  *See* Pl. Resp. Br., Dkt. 52 at 22; *see also Davis v. Con-Way Transp. Central Express, Inc.*, 368 F.3d 776, 784 (7th Cir. 2004) ("The focus of a pretext inquiry is whether the employer's stated reason was honest, not whether it was accurate, wise, or well-considered."); *Kuhn v. Ball State Univ.*, 78 F.3d 330, 332 (7th Cir. 1996) ("employers may act for many reasons, good and bad; they may err in evaluating employees' strengths; unless they act for a forbidden reason, these errors do not matter.").

Finally, Mr. Taylor argues that two inappropriate comments made by Mr. Russom more than two years after he resigned from Lilly constitutes evidence of discriminatory motive on the part of Mr. Russom.  While the Seventh Circuit has concluded an employer's statement regarding a hiring decision based upon racial animus can be direct evidence of discrimination, "stray remarks that are neither proximate nor related to the employment decision [at issue] are insufficient to defeat summary judgment."  *Nichols v. Southern Ill. Univ.-Edwardsville*, 510 F.3d 772, 781 (7th Cir. 2007).  In this case, the comments made by Mr. Russom were not proximate in time to Lilly's employment decision regarding Mr. Taylor when they occurred over two years after he left Lilly (and approximately three years after Mr. Taylor's first alleged adverse employment action took place).  Furthermore, Mr. Russom's comments concerning the context of another employee's hiring had nothing to do with Mr. Taylor's alleged adverse employment action.  *See Overly v. KeyBank Nat'l Ass'n*, 662 F.3d 856, 865 (7th Cir. 2011).  Even viewing the facts in a light most favorable to Mr. Taylor, the fact that in 2009 Mr. Russom was frustrated with Lilly's hiring guidelines concerning "white men", those facts by themselves do not support a reasonable inference that he did not grant Mr. Taylor merit pay in 2006 and 2007 because of his race.  In short, Mr. Taylor has not presented sufficient evidence from the record to suggest that Lilly's explanation is a pretext for race discrimination.  Therefore, his 2006 and 2007

disparate pay claims fail as matter of law.  Accordingly, the Court grants summary judgment on Mr. Taylor's merit pay claims to Lilly.

**B.      Mr. Taylor's Disparate Demotion Claim**

Next, Mr. Taylor argues that Lilly's actions resulting in him being coached to take a lower ranked sales representative position was essentially a demotion, and this alleged adverse employment action was prompted by race discrimination.  Like in his disparate pay claims, Mr. Taylor has presented no direct evidence of race discrimination; therefore, he must use the burden shifting *McDonnell Douglas* framework.  As such, Mr. Taylor has the burden to show, among other requirements, that he suffered an adverse employment action.  "[A] demotion may be a materially adverse employment decision [when] that demotion is manifested by formal downgrade or by informal actions such a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Simpson v. Borg-Warner Automotive, Inc.*, 196 F.3d 873, 876 (7th Cir. 1999) (citation and internal quotations omitted).  Additionally, "the question whether a change in an employee's job or working conditions is materially adverse, rather than essentially neutral is one of fact…and so can be resolved on summary judgment only if the question is not fairly contestable." *Williams v. Bristol-Myers Squibb Co.*, 85 F.3d 270, 274 (7th Cir. 1996).

Mr. Taylor contends that a verbal warning given to him by his B2B manager, Mr. Russom, was adverse because it constituted a constructive demotion.  *See* Pl. Resp. Br., Dkt. 52 at 25.  The Seventh Circuit in *Simpson v. Borg-Warner Automotive, Inc.* recognized the cause of action for constructive demotion.  *Simpson*, 196 F3d at 876 (articulating that a constructive demotion analysis is the same as that for constructive discharge).  "A constructive discharge

19

constitutes an adverse employment action [and]…occurs when the plaintiff shows that he was forced to resign because his workings conditions, from the standpoint of the reasonable employee, had become unbearable." *Chapin v. Fort-Rohr Motors, Inc.*, 621 F.3d 673, 679 (7th Cir. 2010). Thus, in order to prevail on his disparate demotion claim Mr. Taylor must demonstrate two elements: 1) his work conditions were so unbearable that a reasonable person would be compelled to leave his prior position and 2) the unbearable work environment was due to unlawful discrimination. *Simpson*, 196 F.3d at 877.

Mr. Taylor asserts that the verbal warning that Mr. Russom gave to him included unrealistic objectives requiring him to accomplish certain goals regarding access and sales. Accordingly, Mr. Taylor contends that the verbal warning was a "plan to move [him] out" of the B2B Corrections group and as such constitutes a materially adverse employment action. Dkt. 52-4 at 116:3-117:7. Additionally, Mr. Taylor argues that his transfer to the diabetes health group was adverse because it made it more difficult for him to receive a higher merit pay raise when his position was in a lower pay scale group and affected his "percent in range".[8] *See* Dkt. 52 at 14. The Court disagrees.

Mr. Taylor voluntarily left the B2B account executive position after he applied for and was offered a position with the diabetes health group. This transfer did not cause Mr. Taylor a reduction in his pay or a major shift in his overall job duties. As such, Mr. Taylor has not established that his transfer caused him to suffer a materially adverse employment action. *See Williams*, 85 F.3d at 274 (articulating that a transfer does not rise to a materially adverse employment action when the "transfer involve[es] no reduction in pay and no more than a minor change in working conditions."). Additionally, Mr. Taylor cannot point to Mr. Russom's verbal

---

[8] According to Mr. Russom's testimony during his deposition, a "percent in range is the relative position of an employee's basic pay to the entire salary scale of his or her pay level." Dkt. 48-2 at 151:12-14.

warning outlining certain objectives as an adverse employment action when Mr. Taylor was not at risk of immediately being terminated after receiving the performance-related warning. *See Chapin*, 621 F.3d at 679 (citing *Cigan v. Chippewa Falls Sch. Dist.*, 388 F.3d 331, 333 (7th Cir. 2004)) (finding no claim for constructive discharge (comparable to constructive demotion) when no reasonable person would believe that had the plaintiff not resigned, he would have been immediately fired) (internal quotations omitted).

Lastly, Mr. Taylor's argues that his transfer to the diabetes health group constituted an adverse employment action because it made it more difficult for him to receive a pay raise. On this point, the Court finds the case of *Williams v. Bristol-Myers Squibb Co.* to be instructive. In *Williams*, the plaintiff argued that a lateral transfer within her company was a demotion constituting an adverse employment action, because her earnings from sales commissions would decrease as a result of the transfer. *Williams*, 85 F.3d at 272. The Seventh Circuit concluded that an indirect or minor effect on her commission income was not sufficient to constitute an adverse employment action, when it was a fraction of the plaintiff's total income. *Id.* at 274. In the present case, Mr. Taylor's base pay was unaffected after his transfer to his sales position. Any effect with respect to his compensation concerning his potential pay raise would be minor compared to his total income, given the classification of the pay scale group. Thus, based on these facts, the Court finds that Mr. Taylor has not set forth sufficient information to make his transfer in this case adverse. Accordingly, Mr. Taylor's disparate demotion claim must fail as a matter of law and Lilly is entitled to summary judgment on this issue.

## IV. **CONCLUSION**

For the foregoing reasons, Lilly's Motion for Summary Judgment is **GRANTED**. Final

judgment in favor of Lilly will accompany this Entry.


SO ORDERED.    09/26/2012


Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana


DISTRIBUTION:

Kevin W. Betz
BETZ & BLEVINS
kbetz@betzadvocates.com

Sandra L. Blevins
BETZ & ASSOCIATES
sblevins@betzadvocates.com

Ellen E. Boshkoff
FAEGRE BAKER DANIELS LLP - Indianapolis
ellen.boshkoff@faegrebd.com

Benjamin C. Ellis
BETZ & BLEVINS
bellis@betzadvocates.com

Matthew Louis Schmid
SANFORD WITTELS & HEISLER, LLP
mschmid@swhlegal.com